Commonwealth ex rel. Chidsey, Attorney General, Appellant, *v.* Black et al.

Argued September 26, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Charles E. Kenworthey,* with him *Harold A. Stewart, Francis J. Gafford,* Deputy Attorney General and *T. McKeen Chidsey,* Attorney General, for appellant.

*James Gregg,* with him *Portser, Gregg & McConnell, Douglass D. Storey* and *Thos. E. Whitten,* for appellees.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 21, 1949:

The Commonwealth on the relation of the Attorney General filed a Bill in Equity in the Common Pleas Court of Dauphin County praying that an injunction be issued, preliminarily until hearing, and permanently thereafter, restraining defendant's strip mining operation in a tract of land in Westmoreland County, in order to prevent the discharge of acid mine drainage and other industrial wastes into the. clear waters of the Powdermill Run and Loyalhanna Creek, which waters are devoted to public use.

The Chancellor granted the preliminary injunction, and after final hearing wrote an opinion in which he

discussed the complicated geological problems he believed were involved in the controversy, and on the basis of his conclusions of the inevitability of substantial drainage of the acid mining water into the streams refused to grant a permanent injunction against mining, but permanently restrained defendants from so "conducting their mining operations on the tract as *to pollute* the clean streams by acid mine water and by other means", and retained jurisdiction pending subsequent developments. After argument on the exceptions filed the Commonwealth amended the prayer of its Bill and prayed in the alternative that the court enjoin defendants' mining operations until the latter have secured the approval from the Sanitary Water Board of a required proposed drainage and disposal plan. After exceptions were filed and argument heard before the court en banc and the filing of the amended prayer of the Bill, the Chancellor filed another opinion in which he directed attention to the alternate theory of the Commonwealth. The court therein held that as the testimony established that there would be no acid mine draining from defendants' mining operations into the streams, procurement of a permit from the Sanitary Water Board was not required under §313 of the Act of 1945, P. L. 435, as no public nuisance existed.

The facts are these: On June 8, 1948, defendants leased a strip of mining rights in a tract of land in Westmoreland County, containing about 236 acres, in proximity to a stream known as Powdermill Run, which is the main tributary of Loyalhanna Creek. This tract contains about 95 to 100 acres of coal which the defendants propose to remove by the strip mining method. The lease contract provided that the mining operations were to begin within 60 days. In August defendants moved their equipment onto the property and began operations. On September 16, 1948, defendants made

application under section 7 of the Act of 1945, P. L. 435 (35 PS 691.311) to the Sanitary Water Board for approval of a plan of the proposed drainage and disposal of the acid mine drainage of the mine. Late in September a conference was held, but no action was taken by the Board. Within a few days thereafter, September 30th, the owners of the property and defendants joined in a petition for a declaratory judgment, filed in Westmoreland County Court of Common Pleas asking that court to declare that the defendants were not required to obtain the approval of the Sanitary Water Board [1] on the basis that §313 of the above Act was inapplicable to a strip mining operation. The Westmoreland Court entered the decree as prayed for. Relying on the declaratory judgment defendants began their mining operations without obtaining the approval of the Sanitary Water Board. On October 11, 1948, the Commonwealth filed its Bill in Equity.

The questions involved in this appeal are succinctly set forth in Appellant's paper book,[2] as follows:

"1. Were defendants required to obtain approval by the Sanitary Water Board of a plan of the proposed drainage and disposal of acid mine drainage before opening their coal mine?

2. Where the Attorney General brings an action to enjoin a mining operation on the ground that no practical method can be employed to collect, treat and dispose of the acid mine drainage in such manner as to prevent the pollution of a clean stream devoted to public use and, in the alternative, for an injunction until the approval by the Sanitary Water Board of a plan of the proposed drainage and disposal of the acid mine drain-

---

[1] Appellants state in their paper book that the Sanitary Water Board had no notice or knowledge of this proceeding until after the decree had been entered.

[2] The Appellee filed no counter statement of questions involved.

age, and the court below finds that the treatment process proposed by the defendants should succeed in preventing pollution and therefore refuses a permanent injunction against mining:

(a) Should the Attorney General be held to have waived the request for the alternative injunction?

(b) Did the Attorney General fail properly to make the request for the alternative injunction?

(c) Can the Attorney General waive the jurisdictional power of the Sanitary Water Board?"

The court below answered question No. 1 in the negative and question No. 2 (a), (b), and (c) in the affirmative.

Much confusion arises in this case from the fact that while the Bill in Equity was filed on October 11, 1948, the amendment to the bill was not filed until April 12, 1949, and though the original bill mentioned the defendants' application of September 10, 1948, to the Sanitary Water Board for a permit to conduct its said strip or open pit mining operations, the relief then sought was based on the allegations that "Unless defendants' strip and open pit mining operations immediately are abated, they will constitute a public nuisance," and "The discharge of industrial wastes into the said clean streams without a permit will constitute a public nuisance." The prayer of the bill was "That the Court direct that defendants, promptly and within a reasonable time, shall remove from the above described tract of land all of the material in the existing spoil piles or take such steps as may be necessary to prevent the discharge of acid mine drainage and other industrial wastes in the said streams." In the amendment filed *six months later* the court was asked to enjoin the defendants from doing anything in their open pit mining operation *until the defendants* "shall first have obtained the required approval from the Sanitary Water Board."

No objection was made to the filing of this amendment. The testimony in the case was filed December 9, 1948. The defendants' motion to dissolve preliminary injunction and to dismiss the bill was filed October 21, 1948.

In the opinion filed on April 29, 1949, the court after referring to the fact that the amendment to the prayer of the bill was filed under Equity Rule No. 56 [3] said: "The prayer of the bill was to restrain mining, not to restrain mining until the approval of the Sanitary Water Board was obtained. The averments of the bill with reference to that Board were deemed to be but incidental to the threatened pollution. By far the greater part of the testimony as a whole, and of the plaintiff's brief, were directed to the threatened pollution. Having made an issue of the pollution, it comes with ill grace to say that that aspect of the case should now be disregarded, and that the findings of fact, based upon the testimony of record, should all be set aside and the case resolved upon an entirely different and alternate theory. However, since the prayer of the bill has been amended, we shall direct our attention to the alternate theory on its merits." The court then points out that the "statute involved relates to preserving and improving the purity of the waters of the Commonwealth. It is found in 1937 P. L. 1987, as amended by 1945 P. L. 435, 35 PS 691.1 et seq". The court then said: "The record testimony in this case shows conclusively that there is no acid mine

---

[3] Equity Rule 56 reads as follows: "All pleadings may be amended, as of course, at any time prior to final decree, so far as relates to the prayers for relief or any other unimportant matter, and, in all other respects, including the addition or substitution of parties, at any time prior to the filing of the next pleading, or, within ten days thereafter, in order to harmonize with its averments; and they may be amended in any respect, at any time prior to an appeal from the final decree, by leave of the court upon cause shown, on such terms and conditions as to trial, continuance and costs as to the court shall seem meet."

drainage from the operation of the defendants into the streams involved. Hence, there is no unlawful act and no nuisance."

The court then cites Section 691.313 of 35 Purdons Statute, which provides: "Before any existing or new coal mine may be opened or reopened, and before any existing coal mine may be continued in operation, a plan of the proposed drainage and disposal of industrial wastes, and acid mine drainage of such mine, shall be submitted to the Sanitary Water Board, and it shall be unlawful to open or reopen any such mine, or to continue the operation of any mine, or to change or alter any already approved plan of drainage and disposal of industrial wastes, and acid mine drainage from such mine, unless and until the board, after consultation with the Department of Mines has approved such plan or change of plan: Provided, however, That this section shall not apply to the continuation of the operation of an existing mine until sixty (60) days after the effective date of this act." The court said: "All of these sections are part of Article III and must be considered with reference to each other. They exhibit a plan designed to protect clean streams as far as possible. When acid mine drainage may be diverted from a clean stream to a polluted stream, the act provides a method by which that result may be accomplished. In that event, the Sanitary Water Board is clothed with authority to approve such plans, and proceeding without such approval is made unlawful. But these provisos were never intended to apply to a situation where there is no acid mine drainage into a clean stream. To so interpret them would be unreasonable and absurd. In the present case, where the record shows no acid mine drainage into clean streams, it would be futile to submit plans for drainage into polluted streams. There can be no such plan unless drainage into a clean stream is first established. It has not been established in the present case."

The court said further: ". . . the Attorney General is the chief legal advisor of the Commonwealth. As such, it is his duty to advise the agents and officers of the Commonwealth, including the Sanitary Water Board. Complying with the request for an injunction until the Sanitary Water Board has approved plans of disposal would mean that that Board might act upon an entirely different record than that before us and might reach a different conclusion. We feel that the Commonwealth, having brought about this dilemma, should be bound by the record before us. Having asked the Chancellor to find facts and to make conclusions of law, it now wants the court to set them aside because they are not favorable to it. We cannot condone this practice. The record having been made, the parties are bound by it."

It probably would have been the better practice for the plaintiff before proceeding to amend its bill by the addition of such an important prayer as was embodied in its somewhat belated amendment to have asked leave of the court. But since defendants made no objection to this amendment and since the court dealt with the bill as thus amended, we need not pass on the question of whether this amendment to the prayer of the bill amounted, at least by implication, to pleading a new cause of action,[4] to wit, defendants' failure to obtain

---

[4] In *Blair v. Durham*, C. C. A. Tenn., 134 F. 2d 729, 731, it was held that "An amendment does not set up a 'new cause of action' so long as cause of action alleged grows out of same transaction and is basically the same or is identical in essential elements."

In *Hodges v. Price*, Tex. Civ. App., 163 S. W. 2d 868, 870, 871, it was held that "Generally, an amended petition, asserting a cause of action between the same parties and growing out of the same transaction as that alleged in the original petition but filed after limitation had run does not set up a 'new cause of action'."

But see, *Raley v. Evansville Gas & Electric Light Co.*, 45 Ind. App. 649, 90 N. E. 783, 784, where it was held that "An amended complaint sets up a new cause of action . . . where a judgment on

the required permit for its mining operation. If plaintiff, for the relief it sought, intended to rely on defendants failure to secure the required permit it should have so pleaded.[5]

Since the amendment of April 12, 1949, is on this record a part of the bill, the question comes to this: "Should the defendant be enjoined from mining on the tract described 'until the required approval from the Sanitary Water Board is obtained'?" Our answer is: "Yes."

The language of Section 313 of the Act of 1945, P. L. 435 (35 PS 691.313) is unambiguous. It clearly prohibits the opening of any new coal mine, or the reopening of an old coal mine or the continuance in operation of any existing coal mine, until a plan of mine drainage has been approved by the Commonwealth, acting through its official agency. The statute does not say that *if* the mine owners can show that there will be no acid mine drainage into clean streams, such approval need *not* be obtained. In order to avoid the peril of having its streams polluted the Commonwealth assumes that the drainage from every coal mine is a potential menace to the purity of nearby waters, and provides that before such a mine can be opened plans must be submitted which will satisfy the Commonwealth that this peril will be obviated. The defendants' mine is subject to this Act, for we agree with the findings of fact of the court below that the streams involved "are clean streams devoted to public use" and "the coal to be mined and the overburden above it contain oxidizable material which will form acid mine water", and that

the first complaint would be no bar to a judgment on the amended complaint." See also: *Goldberg v. Friedrich*, 279 Pa. 572, 576, 124 A. 186.

[5] Equity Rule 34: "Every bill shall contain, in a concise and summary form, a statement of the facts on which plaintiff relies, . . ."

"it is impossible to determine how soon, or for how long, a mine will produce acid water", and that "it is possible, under favorable conditions, to treat acid mine water and remove the deleterious substances", and that "it is possible to collect and treat the acid mine water which will develop on the tract here involved". The court's other additional finding, the 28th, to wit, "The defendants have not polluted, and do not intend to pollute the streams here involved, but on the contrary have offered a consent decree against pollution", is a finding that is immaterial and irrelevant to the issue framed by the pleadings.

When Section 313 of the Act of 1945 became the law the answer to the question: Will the drainage from any coal mine pollute our streams? ceased to have any bearing on the duty imposed on anyone opening or operating such a mine to submit a plan for the drainage of the mine to the Sanitary Water Board for appropriate official action in respect thereto.[6] If a municipality, for the declared purpose of decreasing fire hazards, should by ordinance provide that no person should erect any building within the boundaries of that municipality without first securing official approval of the building plans, the fact that a person proposed to erect a building entirely of fire-proof material would not absolve that person from the duty of obtaining the required permit. This Commonwealth can choose its own method of protecting the purity of its streams and no one can open or operate a mine here without first complying with the State's mandate with respect to the mine's drainage.

It is unfortunate that most of the testimony taken on this case was (as asserted) "directed to the threat-

---

[6] There is no basis for the contention that the Legislature was not as anxious to guard against acid drainage from a *strip* mine as from a *deep* mine. Both a deep mine and a strip mine create the same type of deleterious drainage.

ened pollution of the streams involved", for this, under the bill as later amended, ceased to be the fact in issue. The bill filed on October 11, 1948, complained of the harm the defendants' coal mining would cause "pure, clean streams of water"; the bill as amended in its prayer on April 12, 1949, was based on defendants' conducting its mining operations without the approval of the plan of drainage and disposal of industrial waste and acid mine drainage, as required by law. We are passing on the bill as the record presented it to us.

On the other questions raised we decide that the Attorney General *cannot* be deemed to have waived the request for the alternative injunction. We decide further that the Attorney General *cannot* waive the jurisdictional power of the Sanitary Water Board. The Attorney General is not a member of the Sanitary Water Board. By Sections 902 and 903 of the Administrative Code (71 PS 292, 293) the Attorney General is given the power and duty to represent administrative boards in proceedings in which such board may be a party or is permitted or required by law to intervene. The Sanitary Water Board is not a party to this litigation. The plaintiff is the Commonwealth of Pennsylvania ex rel. T. McKeen Chidsey, Attorney General, and the action is brought under the Pure Stream Law.

In protecting its streams the Commonwealth is not limited to any one remedy. Section 701 of the Act of 1937 provides as follows: ". . . It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to abate the pollution of the waters of this Commonwealth, and nothing in this act contained shall in any way abridge or alter rights of action or remedies now or hereafter existing in equity, or under the common law or statutory law, criminal or civil, nor shall any provision in this act, or the granting of any permit under this act, or any act done by virtue of this act, be construed as estopping the Commonwealth, persons or municipalities, in the exercise of their rights

under the common law or decisional law or in equity, from proceeding in courts of law or equity to suppress nuisances, or to abate any pollution now or hereafter existing, or enforce common law or statutory rights."

Under the law of this Commonwealth the defendants had and have no right to open their strip mine until they complied with the provisions of Section 313 of the Act of 1945, supra, and the equitable relief prayed for should be granted.

Therefore, the decree of the court below is vacated and the following decree is entered:

*First,* the defendants shall within a reasonable time remove from the tract of land described in the bill all of the material in the existing spoil piles or take such steps as may be necessary to prevent the discharge of acid mine drainage and other industrial wastes in Powdermill Run and Loyalhanna Creek.

*Second,* the defendants are enjoined from doing all manner of acts in furtherance of their strip or open pit mining operations in the tract of land described in the bill until they shall first have obtained the required approval from the Sanitary Water Board.

Each litigant will pay its or their own respective costs.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I would affirm the decree on the able opinion of Judge RICHARDS for the court en banc. The chancellor's competent findings appropriately disposed of all factual issues raised by the pleadings and the adjudication is in strict accord with the provisions of the Pure Stream Law of 1937, as amended (35 PS §691.1 et seq.), under which the Attorney General voluntarily proceeded in a competent jurisdiction at his own considered election. (The Act also prescribes penal sanctions for any violations.) But especially, am I at a loss to see by what

authority an appellate court can ignore, and effectually so overrule, findings of a chancellor, based upon substantial evidence and approved by the court en banc, and then grant injunctive relief which, as in this instance, the learned court below deliberately withheld on the basis of the unimpeachable findings and the intendment of the pertinent statute.