## Abandonment of Coal Mines

LEON EHRLICH, Deputy Attorney General, and THOMAS D. MCBRIDE, Attorney General, October 14, 1958.—You have requested an opinion regarding responsibility for drainage from abandoned mines.

Specifically, you present the following questions:

I. What is an abandoned mine?

II. Does our State have a statutory definition of abandoned mine?

III. Who is responsible for the discharge of wastes and drainage from abandoned mines? Is it the owner, the lessor of the mineral rights, or the two jointly?

IV. Does discharge of mine drainage constitute a waste discharge over which the water pollution control agency has jurisdiction?

V. Under what conditions would control of discharges from abandoned mines be a State responsibility?

VI. What requirements does our State have regarding the process of abandoning a mining operation? What is required in the form of terminal activities which have effect on water pollution such as backfilling, reclamation, etc.? Is this covered by permit requirements for operations or by other procedures?

In response to the foregoing, we advise you as follows:

I. To define "abandonment" in the abstract is a difficult task since it involves a factual determination of the intention of the mine operator or owner as ascertained by his conduct or expressions. Whether a mining operation is or is not abandoned, therefore, can be determined only in relation to a given set of facts.

Webster's New International Dictionary, 2d Ed., 1950, defines "abandonment" thusly: "Act of abandoning, or state of being abandoned (in any sense); total desertion";

"Abandon" is defined as: "To relinquish or give up with the intent of never again resuming or claiming

one's rights or interests in; to give up absolutely";

Black's Law Dictionary contains the following: "Abandonment. The surrender, relinquishment, disclaimer, or cession of property or of rights." . . .

"To constitute 'abandonment' of a mining claim, there must be an intention to abandon, coupled with an act by which the intention is carried into effect." See 1 Words and Phrases 47 et seq.; 58 C. J. S. §§77 and 89.

Section 2 of the Coal Mine Sealing Act of June 30, 1947, P. L. 1177, 52 PS §28.2, defines "abandoned coal mine" thusly:

"The term 'abandoned coal mine' shall mean any coal mine in which mining operations have ceased because of the complete exhaustion of coal which it is practical to mine within the foreseeable future, or where exemption from taxation has been allowed because of the absence of mineable coal."

It appears that unless a statute defines "abandonment", as does the Coal Mine Sealing Act of 1947, and does so clearly, the matter becomes one of examining the mining operation to determine the intention of the owner or operator. Even the Mine Sealing Act definition leaves open questions in other than the situation where exemption from taxation has been allowed because of the absence of mineable coal, e.g., when is coal completely exhausted? When is coal exhausted to a point where it is not practical to mine within the foreseeable future?

To aid in determining whether the facts indicate abandonment, the following lines of inquiry may be pursued:

A. If the owner or operator has stated in the filing of a notice with the Department of Mines and Mineral Industries or has affirmatively stated in some report filed with that department or any other agency that he intends to abandon his operation, that would be the

clearest expression of intention. Such situation should preclude further inquiry, provided that the operator or owner has done nothing inconsistent with his expressions and that there is physical evidence of abandonment to substantiate the affirmative expressions.

B. If the owner or operator has stated in the filing of some report with the Department of Mines and Mineral Industries or in some other manner merely that he intends halting operations, the question remains whether the cessation of operations is equivalent to or is in fact abandonment; a study of the operation itself, in such case, would have to be undertaken.

The factors to be considered and the lines of inquiry to be pursued may be as set out below. It should be pointed out that determining whether a deep mine has been abandoned is a bit easier since there is more physical evidence than in the case of a stripping operation, and some of the following apply to only one of the two methods of operation:

1. If there was a lease, was it terminated or cancelled? The termination of a lease might indicate abandonment of operations.

2. Inquiry of taxing authorities for reports filed by operator or owner should be made. Real estate assessment evaluations and appeal statements in regard thereto should be reviewed. Frequently, to invite a reduction of assessment, there may be a statement of abandonment included in the proceedings. If so, that would be clear expression of intent.

3. If the operator has ceased to file reports regularly with the Department of Mines and Mineral Industries, that may be taken as an indication of abandonment. If the operation is one of stripping and the operator has permitted his stripping registration to lapse, that would point to abandonment.

4. Physical facts tending to show abandonment may be ascertained by actual inspection. Thus, evidencing

an intent to abandon are the following, some of which items are applicable to only strip operations and some to only deep mining:

a. All mineable coal has been extracted.

b. The workings have been exhausted.

c. Backfilling of stripping operations has been accomplished.

d. The mine has been sealed.

e. Highwall erosion has started.

f. Maintenance of the operation has been discontinued.

g. Ventilating equipment, rails, roadways, machinery and premises have been neglected.

h. Machinery such as pumps, rails, etc., have been removed.

i. The workings have been permitted to seep out water.

j. The roof has been permitted to cave.

k. The workings have been fenced off.

l. The operation has not been fire bossed.

m. The work of maintaining supporting pillars to prevent surface subsidence, etc., has been discontinued.

n. It is impracticable to mine further because of fire, water, gas, or surface hazards.

o. It is impracticable to mine further because of lack of machinery or because of inadequate machinery.

5. Economic conditions may tend to show abandonment as when : (a) The quality of coal is so poor as to make the continuation of the operation inadvisable or economically unsound; (b) the amount of coal remaining is so small in amount as to negate the economic feasibility of operation; (c) the operator lacks capital or credit to continue the operation; (d) market conditions are such as to negate possible sale of the coal produceable at this particular operation; (e) it is impracticable to continue further mining because

of excessive costs; (f) the mining site has been made inaccessible in some fashion.

6. The time in which an operation remains idle may be evidence of abandonment; there is a strong indication of abandonment if there is a long span of idleness.

To summarize, if the person viewing the operation, on the basis of experience in the field and considering those of the foregoing criteria applicable to the operation, finds as a reasonable conclusion that there has been abandonment, then that conclusion should be respected and the operator called upon to prove otherwise.

II. The only statutory definition occurs in The Coal Mine Sealing Act of 1947, referred to, supra.

III and V. As to the responsibility for the discharge of wastes and drainage from abandoned mines, section 3 of The Mine Sealing Act, supra, requires an operator, and it would make no difference if the operator were the owner or lessee if those are different parties, in possession of an abandoned mine to seal off openings through which water may flow to Commonwealth streams. Section 4 places responsibility for sealing on the Commonwealth when an operator was not in possession on the effective date of the act, and section 5 requires the Commonwealth to maintain seals on all sealed mines.

In addition, there remains on the statute books the provisions of the Act of May 7, 1935, P. L. 141, 52 PS §§809 to 813, applicable only to bituminous mines. These provisions place responsibility equally upon the owner, operator or lessee for sealing abandoned mines which are discharging polluted water into streams or rivers of the Commonwealth. In the event of their failure to do so or their being unknown or unlocatable, the Department of Mines is to enter the land and perform the sealing.

Thus the obligation for sealing is primarily upon the operator, who may be either the owner or the lessee, under the Mine Sealing Act of 1947, but upon the owner, operator or lessee under the Act of 1935. It has not been so determined by any court, but it would appear that the provisions of the act of 1935 are partially inconsistent with the 1947 legislation, and so, pursuant to section 10 of the Act of 1947 repealing all inconsistent acts and parts of acts, the 1935 Act should not be relied upon where the question of the pollution of streams is involved.

IV. Whether the discharge of mine drainage constitutes a waste discharge over which the Sanitary Water Board has jurisdiction is answered by the courts in cases arising under the Act of June 22, 1937, P. L. 1987, as amended, 35 PS §§691.1 to 691.701, relating to the protection of public water supply.

In Commonwealth ex rel. Chidsey v. Black, 363 Pa. 231, 69 A. 2d 376 (1949), the Supreme Court of Pennsylvania recognized the absolute duty of anyone opening or operating a deep or strip mine to submit a plan for the drainage of the mine to the Sanitary Water Board for appropriate official action. See also Sanitary Water Board v. Anthony, 66 Dauph. 250 (1954). The section dealing with acid mine drainage makes it unlawful to discharge or permit the discharge of acid mine drainage into "clean waters of the Commonwealth." It would appear therefore that such prohibition applies to operating and nonoperating mines.

That the act applies to collieries as well as mines is clear; if the colliery is considered part of the mine, it would be covered by the act under sections 310 and 311, 35 PS §§691.310 and 691.311; if the colliery is considered apart from the mine itself, then its operation in this area would be governed by those sections governing the discharge of industrial wastes into wa-

ters of the Commonwealth. See sections 1 and 301 of the act, 35 PS §§691.1 and 691.301.

It might be well to note that section 200 of The Fish Law of May 2, 1925, P. L. 448, as amended, 30 PS §200, and section 17 of the Act of May 1, 1873, P. L. 89, as amended, 30 PS §361, dealing with the pollution of waters and generally considered as part of the fishing laws of the Commonwealth, further restrict pollution and also appear to apply to operating mines or collieries. Section 200 of The Fish Law vests jurisdiction as to the administration of that act in the Pennsylvania Fish Commission.

VI. Regarding your inquiry as to the process of abandoning a mining operation, section 3 of the Mine Sealing Act, discussed supra, covers the situation generally.

However, there are additional statutory provisions in this area. In regard to anthracite deep mining operations, the Act of June 2, 1891, P. L. 176, 52 PS §§71 to 617, in part, contains certain requirements. Section 2 of article XIV, 52 PS §162, requires notice to be given to the district mine inspector where a mine is abandoned or work on an abandoned mine is recommenced. Article III, sec. 3, 52 PS §263, requires surveys of abandoned workings which will be filled with water to be filed with the district inspector. Article IV, sec. 7, 52 PS §412, requires fencing. Article X, sec. 5, 52 PS §569, and article XII, sec. 4, 52 PS §572, impose a duty to keep abandoned mines free from dangerous bodies of gases or water.

Bituminous deep mine operations are subject to similar statutory provisions upon abandonment. These are found in the Act of June 9, 1911, P. L. 756, 52 PS §§701 to 1393, in part. Article III, sec. 5, 52 PS §805, imposes on a mine superintendent the duty of prohibiting the mining of coal within 50 feet of any abandoned mine or an abandoned portion of any mine

except under certain circumstances. Article III, sec. 8, 52 PS §808, requires notice to the mine inspector when work is resumed at an abandoned mine, and article II, sec. 6, 52 PS §827, calls for similar notice plus mapping when a mine is abandoned. Various safety provisions re gases, fencing and working near or going into abandoned mines are found in article IV, sec. 11, 52 PS §878, article IV, sec. 17, 52 PS §884, article V, sec. 1, 52 PS §921, and article XXV, Gen. Rules 26 and 27, 52 PS §§1306 and 1307.

Anthracite strip mining operations are governed by the Anthracite Strip Mining Law of June 27, 1947, P. L. 1095, as amended, 52 PS §§681.1 to 681.22, which provides for registration with the Department of Mines and Mineral Industries and the posting of bonds to assure backfilling and planting of the affected area. Additionally, section 13 of the act, 52 PS §681.13, deals with drainage, as distinguished from backfilling and planting, and requires proper drainage to be provided by the operator where the condition is hazardous.

The Bituminous Coal Open Pit Mining Conservation Act of May 31, 1945, P. L. 1198, as amended, 52 PS §§1396.1 to 1396.20, contains substantially similar backfilling and planting requirements for bituminous coal stripping operations. There is no provision in the bituminous act, however, comparable to the one dealing with drainage in the anthracite legislation.

It is to be noted, also, in connection with drainage of water, that the Act of July 7, 1955, P. L. 258, 52 PS §§682 to 685, has made provision for an extensive program of control and drainage of water from anthracite coal formations to prevent the flow of surface water into mines and for pumping water from abandoned mines.

In conclusion, therefore, we can state only that responsibility for drainage from abandoned mines depends upon the facts of each case. We have outlined the applicable statutory provisions and noted that mine drainage is within the jurisdiction of the Sanitary Water Board in so far as water pollution is involved.