Commonwealth, Appellant, *v.* Sonneborn et al.

Argued March 14, 1949. Before HIRT, RENO, DITH-RICH, ARNOLD and FINE, JJ. (RHODES, P. J., and ROSS, J., absent).

reargument refused June 20, 1949.

*Francis J. Gafford,* Deputy Attorney General, with him *Lee C. McCandless* and *T. McKeen Chidsey,* Attorney General, for appellant.

*J. Campbell Brandon,* with him *W. D. Brandon* and *Brandon & Brandon,* for appellees.

OPINION BY ARNOLD, J., June 1, 1949:

The defendants were indicted under the Act of June 22, 1937, P. L. 1987, as amended, 35 PS 691.1 et seq., for illegally discharging industrial waste, injurious to animal or aquatic life, into Bear creek and the Allegheny river. The court below, as on a demurrer to the Commonwealth's evidence, gave judgment for the defendants and the Commonwealth brings these two appeals, which were argued together and will be disposed of in one opinion.

L. Sonneborn Sons, Inc. operates an oil refinery at Petrolia, Butler County, manufacturing a medicinal oil called "Nujol." In this process a heavy, sulphuric acid sludge results. In 1932 the corporation constructed a disposal plant, whereby all the sludge was converted into gas and materials used in the plant.

But in 1945, 1946 and 1947, the full capacity of the disposal plant took care of only 91% or 92% of the acid sludge, and the remaining 8% or 9% (with a sulphuric acid content of from 25% to 40%) was pumped into what is called the northern lagoon,—a pit about 300 feet x 140 feet and 6 feet deep,—where it solidified. Adjacent thereto was the southern lagoon, and both were on the premises of the defendant. Surface water accumulated in the northern lagoon, became impregnated with the acid, and flowed into the southern lagoon.

When the southern lagoon filled with this acid water, the defendants would cut the dike or bank of the lagoon and drain the waters therefrom into Bear creek, a tributary of the Allegheny river. This was done three times a year, and the method was intentionally adopted and used. The cut in the bank or dike of the southern lagoon was always made in the nighttime.

About midnight of July 2, 1947, on direct orders from one of the defendants and following the defendants' regular practice, an employe cut the dike of the southern lagoon, thereby discharging about 475,000 gallons of liquid sludge, or water impregnated with sulphuric acid, into Bear creek. The Commonwealth amply proved that this discharge of industrial waste was injurious to animal or aquatic life, and there was considerable testimony that a great number of fish were killed thereby. In fact the defendants made little or no pretense of controverting this.

Stopping here, there was abundant evidence whereby the jury could find that the defendants discharged into the stream industrial waste prohibited under §§301 and 302 of the Act (35 PS 691.301, 302).

Section 302 provides that such discharges must be discontinued on notice from the Sanitary Water Board, but it also provides that *any* discharge that is injurious to animal or aquatic life *"shall nevertheless be deemed unlawful and a nuisance whether the board shall so declare or not."* (Italics supplied.) Thus it is apparent that the offenses prohibited by the statute, and for which the defendants were indicted, were malum prohibitum, and the defendants' intent is wholly immaterial; for whether the board had or had not directed discontinuance of industrial waste discharges was no defense to the indictments.

Up to this point, therefore, the case had to be submitted to the jury, for if the Commonwealth's testimony was believed, the defendants had discharged into the

waters of the Commonwealth, industrial waste inimical and injurious to aquatic life. We repeat that no question of intent was involved in this malum prohibitum offense.

The defense presented, and which the court below pronounced valid, concerned the amendment of 1945 to the Act of 1937. Under the Act of 1937, §302 consisted of the one paragraph referred to and now printed on the margin.[1] As that section stood, the discharge of industrial waste inimical to aquatic life was unlawful "whether the board . . . so declare or not."

But the defendants set up that §302 had been amended by the Act of 1945 which reënacted the first paragraph and added a new paragraph: "Whenever the Sanitary Water Board shall determine, upon cause shown, that certain existing industrial waste discharges cannot be eliminated due to inability to procure necessary labor, materials or equipment . . . [because of World War 2], . . . such industrial waste discharges shall not become unlawful until such time as the Sanitary Water Board shall set, after the board determines that such labor, materials or equipment are available. . . ."[2] This was an affirmative defense, available *only*

---

[1] "Section 302. Existing Industrial Waste Discharges:

"All persons who, at the time of the passage of this act, are discharging industrial waste into any of the waters of the Commonwealth, shall discontinue the discharge of such industrial waste into said waters . . . on notice from the board, when, . . . the board shall declare the discharge of such industrial waste is or may become inimical or injurious to the public health or to animal or aquatic life, or prevent the use of waters for domestic, industrial or recreational purposes: *Provided, That any discharge that is inimical and injurious to the public health or to animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreational purposes, shall nevertheless be deemed unlawful and a nuisance whether the board shall so declare or not."* (Italics supplied.)

[2] The principal purpose of the 1945 amendment was to bring coal mines within the Act of 1937, under which they were exempt.

"whenever the Sanitary Water Board *shall determine, upon cause shown,*" that the discharges cannot be terminated because of shortages arising out of the war. It was therefore essential for the defendants to show such a determination by the Board. The Act does *not* read that industrial waste may be discharged into the waters of the Commonwealth *during* the existence of war or any shortages therefrom. It carefully provides that *if* the Sanitary Water Board *shall determine* that *because* of the war the industrial discharges cannot be terminated, *then* the discharges shall be lawful. The defendants made no attempt to show such determination, which was the indispensable element if their acts were to be lawful, and without which their conduct remained unlawful. The testimony does not even show any effort of defendants to have the Board make such determination.[3]

The defendants offered only a letter from the Sanitary Water Board dated June 20, 1947, the pertinent parts of which read: "The Board, . . . hereby declares that the wastes discharged from your establishment . . . are or may become inimical or injurious [to public health, animal or aquatic life, etc.] . . . and . . . di-

---

[3] The defendants' plant was in full operation at the time of the passage of the Act of 1937, and, in compliance with the Act, the defendants made a report to the Department of Health or Sanitary Water Board showing what industrial waste, if any, was being discharged into the waters of the Commonwealth. This report was dated October 15, 1937, and became Exhibit 26 at the instant trials. It showed that *all* of the acid in the sludge was reclaimed by the disposal plant, and that there was no discharge of acid into any stream. When made, the report was correct and true, but, as we have said, in the years 1945, 1946 and 1947, the capacity of the disposal plant was insufficient to reclaim and convert all of the acid, and the rest was discharged into the stream. The evidence does not disclose any report made by the defendants of the use of the northern and southern lagoons for the purpose described, nor the discharge of acid water into Bear creek from those lagoons, although the defendants directed such use and discharge.

rects you, on or before February 1, 1948, to discontinue all such discharges from your Establishment . . : *or* to submit to the Board for approval, . . . construction plans [for works to provide treatment to reduce the pollution characteristics]." (Italics supplied.) The other parts of the letter suggest the standards for the treatment of the industrial waste, and call for a report on the plant's status to be made August 1, October 1 and December 1 of 1947. It adverts to the desirability of post-war works to provide employment, and states that the Board will fix the time within which any treatment works are to be constructed and in operation.

Palpably this letter does not recite any determination by the Sanitary Water Board that, because of the shortages caused by the war, the defendants' industrial waste discharges cannot be terminated. It does not refer to any shortages of men or materials because of the war. It is simply a notice given under the first paragraph of §302 of the original Act of 1937, reënacted in the 1945 amendment, declaring that the defendants' industrial waste discharges were or might become inimical or injurious to animal or aquatic life, etc.; and calling upon the defendants, under that paragraph, to discontinue such discharges on February 1, 1948, *or* (in lieu thereof) file plans for a treatment works; and by this very clause, retained and reënacted, *such discharges were unlawful whether or not so declared.*

The letter, therefore, did not establish the defense, and since neither intent nor bona fides is relevant, the court erred in sustaining the demurrer.

In appeal No. 181, April Term, 1948, the judgment is reversed and a new trial ordered.

In appeal No. 182, April Term, 1948, the judgment is reversed and a new trial ordered.