## Fagnani v. City of Philadelphia

*Joseph V. Furlong, Jr.* and *A. Bernard Hirsch,* for plaintiff.

*Edward G. Bauer, Jr., Karl I. Schofield* and *Bernard M. Gross,* for City of Philadelphia.

WEINROTT, J., July 8, 1965.—This is an equity action in which implications of possible municipal carelessness loom larger than any asserted inequity to the principal complainant. In this specific case a self-confessed oversight by an important city official, had it not been brought to light and corrected in time, would have cost the city a needless expenditure of a considerable sum.

In addition, it appears from this case that the number one bidder for a municipal contract may walk into a commissioner's office, tell the commissioner he had made a mistake in judgment, and in effect walk out with a release from his bid and a refund of his deposit check.

The essential facts are few. The city invited bids last year for construction of a sewer in the Eastwick section. The specifications called for vertical walls in trenches, which require more expensive construction processes than do sloping walls. The low bidder understood that in past years the city's representatives had condoned sloping sides despite such specification, and assumed that they would do so in this instance. He computed his costs accordingly, and due largely to that method of calculation his bid was some $158,000 less than the next lowest bid. Then, when the contract was on the verge of being awarded, he learned that the city's engineers intended to insist on strict compliance with the specifications. He hastened to apply for relief. The city officials in charge gave him his deposit money back. They immediately reviewed the project and decided it had been a mistake to demand vertical walls, and that by permitting sloping sides

in at least part of the trench the city could save more than $100,000. Accordingly, they rejected all bids and drew up a revised proposal. Before they could accept bids on the new proposal, however, the second lowest bidder on the original project, in his capacity as a taxpayer, together with another taxpayer, filed the instant suit in equity for an injunction against the city and the two commissioners involved. Defendants filed preliminary objections in the nature of a demurrer, which are still pending. Meanwhile, however, after a preliminary hearing this court granted a temporary injunction against the accepting of bids on the revised proposal. A final hearing now has taken place and the question before the court is whether to grant plaintiffs relief or to dismiss the complaint.

In the course of the testimony, Water Commissioner Samuel S. Baxter, in charge of the preparation of specifications for the sewer line, said that it was customary in almost all instances for the city to require the more expensive vertical trenching. Inclusion of the requirement on this occasion appears to have been routine. On review following the turmoil in this case, Mr. Baxter conceded, he found it had been a mistake in part to prohibit sloping sides. The error, he said, had been overlooked in the press of departmental duties.

The inference is obvious that similar oversights may have occurred in previous instances, both during the present regime and in prior administrations, and that they may have caused a waste of taxpayers' money.

Another disturbing factor is the apparent ease with which a bidder can escape the consequences of a miscalculation, and even of a deliberate, though misguided, intention to circumvent the city's requirements. Though it is technically beyond the duty of this court, we venture to suggest that the proper authorities might look into the propriety of tightening up bidding practices.

However, the court believes that the record in this case would not sustain a finding of fraud or collusion on the part of Mr. Baxter, or of his co-defendant, Procurement Commissioner Otto R. Winter. Oversight by Mr. Baxter, yes; carelessness on his part, perhaps; an indulgent friendliness toward a devious bidder, again perhaps; but fraud or collusion by either commissioner, no.

With that preliminary outline, we proceed to our formal findings.

## FINDINGS OF FACT

1. Plaintiff, Helen K. Fagnani, is a resident and taxpayer of the city and county of Philadelphia.

2. Plaintiff, A. J. Feraco, trading as A. J. Feraco Construction Company, is a taxpayer of the said city and county, and is engaged in the business, inter alia, of constructing municipal sewers.

3. Defendant, city of Philadelphia, is a municipal corporation of the first class of the Commonwealth of Pennsylvania.

4. Defendant named in the complaint as Samuel Baxter is the commissioner heading the city's Department of Water, and as such at all times pertinent to this case had among his duties that of supervising the preparation of plans and specifications for, and the construction of, sewers and accessory projects in the city.

5. Defendant named in the complaint as Otto Winter is the commissioner heading the city's Department of Procurement, and as such at all times pertinent to this case had among his duties that of receiving and considering bids for municipal construction, including construction of sewers and accessories, of awarding and entering into contracts therefor in behalf of the city, of receiving security deposits from bidders, and of performing other duties related to the foregoing.

6. Prior to August 11, 1964, the city of Philadelphia proposed to construct a sewer in 74th Street from Eastwick Avenue to Drainage Street in the southwestern area known familiarly as Eastwick.

7. By an ordinance dated October 10, 1963, the Council of the City of Philadelphia authorized the construction so proposed.

8. Pursuant thereto, and to his duties in such cases, Water Commissioner Samuel S. Baxter, one of defendants herein, named in the complaint as Samuel Baxter, procured and supervised the preparation by his subordinates and by the engineering firm of Albright & Friel, in behalf of the city, of the formal proposal and special specifications for the construction of the projected sewer, designated as work no. S-3414-E and bid no. 2637.

9. Among the special specifications set forth in the proposal thus designated was the following paragraph:

*"Trenching:* Attention of the Contractor is called to the provision in Clause E-9 (Standard Specifications for Excavation, etc.) wherein the sides of all trenches must be kept vertical; sloping sides or 'V' cutting will not be permitted."

10. Persons in the trade, including the bidders immediately concerned in this suit, knew that vertical sides entailed need for processes known as sheathing and shoring, and the incurring of labor and expenses substantially greater than that required by sloping sides or "V" cutting (the latter being a trade term indicating in essence the same process as sloping the sides of trenches), which did not necessitate sheathing or shoring.

11. The purpose of requiring vertical instead of sloping sides in trenches is to restrict the width of the tops of the trenches in confined areas or in locations adjacent to structures, and to limit the extent of earth-settling or repaving, or both, after the trenches are refilled.

12. The evidence in this case indicates a probability that in fact the 74th Street sewer proposed as described above was to lie partly in areas where vertical trenching, with its attendant sheathing and shoring, was unnecessary and the greatly less costly "V" cutting was permissible.

13. At the time the specifications were prepared, the persons employed by the city for such preparation, and defendant Water Commissioner in supervising that preparation and in examining the specifications so prepared, overlooked the probable partial lack of need for vertical trenching.

14. It had long been customary in preparing specifications for similar projects in the city of Philadelphia to prohibit "V" cutting in trenches in virtually all instances, and on this occasion the prohibition was included, pursuant to such custom, automatically and without the giving of particular study or thought thereto.

15. The project and an invitation for bidding thereon were duly advertised by or in behalf of defendants, and the bids received were duly opened on August 11, 1964.

16. The three lowest bids so received and opened were submitted by the bidders and in the amounts as follows:

Driscoll Construction Co., Inc. ......... $283,200
A. J. Feraco Construction Co. ......... $441,845
John Meehan &Son ................. $489,840

17. Other and higher bids submitted ranged to amounts in excess of $500,000.

18. The Water Department's own preliminary estimate of the cost of construction, made for its private use and not publicly disclosed, was in a sum not precisely designated to the court but stated to be in excess of $500,000.

19. In computing anticipated costs for the purpose of submitting the bid of Driscoll Construction Co., the lowest bidder, its officers relied on their belief that in similar prior instances, despite prohibitions in specifications against "V" cutting, the city had customarily condoned violations of those prohibitions, and on their expectation that similar condonation would occur in this instance.

20. As a result of such belief and expectation, the price estimate for excavation of conduits in the Driscoll bid was $48,300, as against $165,000 in the Feraco bid and $179,400 in the Meehan bid, or $117,300 below the next lowest bid.

21. As a result of that and other factors, the total Driscoll bid was $158,645 less than the total of the next lowest bid—that of Feraco—and somewhat more below the total Meehan bid.

22. In actual fact the record in this case contains no tangible evidence of a concrete instance of the waiver of vertical trenching or condonation of "V" cutting in violation of specifications asserted by Driscoll as justification for its belief and expectation above recited.

23. At or about the time the bids were opened, the Driscoll Company concluded from information coming to its president that Albright & Friel, the engineering firm designated by the city to oversee the sewer construction involved, intended strictly to enforce the prohibition against "V" cutting, and that such enforcement would raise the cost of excavation far above the company's estimate.

24. In fact at that time the engineering firm did contemplate demanding strict compliance with the specifications, including the one calling for vertical sides in trenches.

25. Because of its information to that effect the Driscoll Construction Company, by its president,

James N. Driscoll, Jr., on August 13, 1964, orally informed Commissioner Baxter of its erroneous assumption and of the severe loss that an award of the contract to it and performance of the contract by it would entail to the company, and requested that it be relieved of responsibility under its bid.

26. On being so informed, Commissioner Baxter telephoned Procurement Commissioner Winter and told him of the Driscoll request, and at Mr. Winter's instance directed Mr. Driscoll to set forth his request and reasons in a letter.

27. On the same day, Mr. Driscoll on behalf of his Company wrote to Mr. Winter, with a copy to Mr. Baxter, stating that its bid of $283,200 "was predicated on the assumption that about 95% of the job would not require shoring"; that since submitting the bid he had been informed "that this method of excavation will not be acceptable in this case"; that sloping allowed in the past had saved the city "millions of dollars a year on this type of job"; that strict enforcement would cause Driscoll "a certain loss substantially in excess of $120,000"; and that the company accordingly requested help "by rejecting our inadequate bid".

28. The Driscoll Company did not at any time assert to any representative of the city that if its request for relief was refused, and the contract was awarded to it, the company would decline to perform the contract at its bid price and in accordance with the contract provisions.

29. On August 18, 1964, Commissioner Baxter sent a memorandum to Commissioner Winter stating that attempted enforcement of the Driscoll bid would lead only to the forfeiture of its deposit check; that Mr. Baxter opposed an award to the second bidder at the latter's bid price of approximately $158,000 more; that the Water Department intended to revise its

specifications and permit "V" cutting in a part of the trench; that Mr. Baxter recommended allowing Driscoll to withdraw its bid, rejecting all bids, and readvertising with new specifications; and that he left to Mr. Winter's judgment the retention of Driscoll's deposit.

30. In the interim, the Driscoll Company had substituted for its $20,000 security deposit a deposit of $12,500.

31. The amount of such deposits is based on the amount involved in the bid, and $12,500 was the sum properly demandable by the city as Driscoll's deposit; the reduction in the deposit was permitted by the Procurement Department as a routine matter without direct participation or authorization by Commissioner Winter.

32. In due course the Procurement Department rejected all bids for the project described above, and returned all deposits to the respective bidders, including both Driscoll and Feraco.

33. Thereafter, Commissioner Baxter caused the revision of the proposal for the 74th Street sewer, designating the revision as work no. S-3414-E, bid no. 2656.

34. The principal change in the revision was the substitution of the following language in the specification relating to excavation:

"*Trenching:* Attention of the Contractor is called to the provision in Clause E-9 (Standard Specifications for Excavation, etc.) wherein the sides of all trenches must be kept vertical; this provision will not apply in 74th St. from the south houseline of Eastwick Ave. to a point 40 feet north of the north right-of-way line of the Reading Co., and therefore the Contractor will be permitted to 'V'-cut the trench in this area. Details of 'V'-cutting must be approved by the Engineer."

35. The rejection of all bids in this case, and the

revision of specifications and seeking of new bids thereon, are in the interest of the city of Philadelphia.

36. In the release of the Driscoll Company from responsibility on its bid, in the reduction and subsequent return of its security deposit, in the rejection of all bids and the proposal to readvertise for new bids with revised specifications, and in all other pertinent respects, the evidence adduced in this case established no fraud or collusion.

37. Before the city proceeded with the acceptance of bids under its revised proposal and specifications, plaintiffs filed this suit, and the court entered a temporary injunction to maintain the status quo pending a final hearing.

38. In addition to prior depositions, a final hearing took place in January, 1965, and thereupon the testimony was closed.

DISCUSSION

At bottom we are faced in this case with a conflict between the interest of the Feraco Company and the interests of the citizens of Philadelphia. Morally, the Feraco firm may present a semblance of a claim for an award of the contrct to it as the lowest responsible bidder after the Driscoll Company was permitted to bow out. The city, on the other hand, is in line to save a lot of money for its citizens by rejecting all bids and seeking lower proposals.

In general, when a conflict arises between the public interest and a private interest, the law favors a construction of legislation that will benefit the public: Statutory Construction Act of May 28, 1937, P. L. 1019, article IV, sec. 52 (5), 46 PS §552 (5) ; Commonwealth ex rel. Shumaker v. New York & Pennsylvania Company, Inc., 367 Pa. 40, 53, 79 A. 2d 439 (1951). Apart from the Statutory Construction Act just cited, this surely is a salutary principle.

The Philadelphia Home Rule Charter specifically

allows the Procurement Department to "reject all bids if it shall deem it in the interest of the City so to do": Section 8-200 (2) (b).

Under the circumstances of this case, unless the Driscoll Company were to perform the work at its bid price, the city will benefit materially by rejecting all bids and setting up a revised proposal.

The city contends, as we understand it, that its only remedy against a defaulting bidder is to forfeit his security deposit, which in this case was only a fraction of the city's prospective loss. Under the view we take of the case we need not decide that point. The actual situation is that the Procurement Department, at the instance of the Water Department, returned Driscoll's deposit and rejected all bids. Loose as the practice may have been in releasing Driscoll, and negligent as the city may have been in demanding complete vertical trenching on 74th Street in the first instance, it does appear probable, albeit on hindsight, that a partial "V" cutting is permissible and that it will save the city a large percentage of the total construction cost.

Despite the charter provision permitting rejection of all bids, decisional language exists to the effect that the right of rejection nevertheless is hedged with the restriction that no fraud or collusion be committed in exercising it: Highway Express Lines, Inc. v. Winter, 414 Pa. 340, 345, 200 A. 2d 300 (1964).

In this instance, however, though the laxity on the city's part opens its representatives to valid criticism, proof of concrete fraud or collusion is lacking.

The actual decision in the Highway Express Case just cited, in which the action of this court dismissing an equity complaint under circumstances analogous to the present situation was sustained on appeal, upholds the city's right to reject all bids as the charter provides. In addition, the decision declares that a dis-

appointed and unsuccessful bidder has no standing to request the judicial award of a public contract: 414 Pa. 346.

That brings us to a subsidiary point raised by defendants here. Both Feraco, the disappointed bidder, and his co-plaintiff, sued as taxpayers. Defendants contend that sewer projects are designed to be self-supporting and their cost comes out of sewer rents rather than out of general revenues, so that taxpayers as such have no standing to complain, and only "rate-payers" or "rent-payers" are affected. We do not know whether either plaintiff here pays sewer rents, and we do not propose to enter into a consideration whether rate-payers or rent-payers, as distinguished from taxpayers, might maintain an equity suit in a case such as the one at bar. We do not deem the question material.

It is our judgment that the city has the right to reject all bids in the case at bar, and that on that basis the complaint should be dismissed. Hence it becomes unnecessary to decide the accessory questions that have cropped up. Furthermore, under the circumstances, defendants' preliminary objections are moot.

### CONCLUSIONS OF LAW

1. Under the evidence in this case, defendant City of Philadelphia, and defendant officials, had a legal right to reject all bids on the proposal for construction of a sewer line in 74th Street from Eastwick Avenue to Drainage Street in Philadelphia, designated as work no. S-3414-E, bid no. 2637.

2. There being no proof of actual fraud or collusion in the case, and its action being in the public interest, defendant city of Philadelphia, by its defendant officials, are deemed to have properly exercised the foregoing right.

3. Plaintiffs, whether they be taxpayers, rate-payers, rent-payers, or in the case of one of them, an un-

successful bidder, have failed to prove any violation of law on the part of defendants or any of them, and have failed to establish any right to injunctive or other relief in the instant suit.

4. Hence the complaint in equity in this case should properly be dismissed, and the preliminary or temporary injunction heretofore granted should be vacated.

5. In view of the final hearing on the merits, and the conclusions of the court thereon, the preliminary objections heretofore filed by defendants to plaintiffs' complaint have become and are moot.

6. Under the evidence in this case, it is incumbent on defendants to discard existing specifications and bids received thereon, and before publishing new specifications for construction of the 74th Street sewer and advertising for or accepting bids thereon, to review carefully and study thoroughly any specifications they have heretofore prepared, and to determine ab initio, after a meticulous examination of the nature of the terrain and all other factors involved, precisely what form of trenching is required and what other specifications are necessary or proper in the construction proposed.

In view of the foregoing, we enter the following:

DECREE NISI

And now, to wit, July 8, 1965, it is ordered, adjudged and decreed as follows:

(1) The complaint filed herein is dismissed.

(2) The preliminary injunction heretofore entered in this cause is dissolved.

(3) Before proceeding any further with the project to construct a sewer in 74th Street with which this case is concerned, defendants shall discard existing specifications and bids received thereon, and shall make a careful and thorough study of the nature of the terrain, the kind of trenching required, and all other factors involved in such construction, and shall prepare

ab initio a full, competent, comprehensive and proper set of specifications therefor.

(4) Defendants shall pay all costs.

The prothonotary is directed to enter this decree nisi and give notice thereof to the parties and their counsel, and unless exceptions thereto are filed within 20 days thereafter, the decree nisi shall be entered as a final decree by the prothonotary as of course.