## Commonwealth v. Baumgardner Oil Co.

*Michele Straube,* for the Commonwealth.
*Jan G. Sulcove,* for defendant.

KELLER, *J.,* December 12, 1984—On November 9, 1982, the Commonwealth of Pennsylvania, De-

partment of Environmental Resources (DER), initiated a criminal prosecution against Baumgardner Oil Company, Inc., of Fayetteville, Pennsylvania, under sections 691.307(c), 611 and 602(a) of the Clean Streams Law, Act 394 P.L. 1987, June 22, 1937 as amended, October 10, 1980 Act 157, 35 P.S. §691.1 et seq. The proceeding commenced with the issuance of a citation by District Justice Shoemaker on DER's complaint that on or before September 1, 1982 defendant discharged industrial waste oil into the waters of the Commonwealth; specifically into an unnamed tributary of Cold Springs in violation of the effluent limit set forth in defendant's Water Quality Management Permit.

Following a summary trial on March 7, 1983, defendant was found guilty and sentenced to pay a fine of $100 and the costs of prosecution. Defendants filed a timely appeal and the matter came before this court for trial de novo on May 10, 1984.

The bulk of the evidence admitted at trial was received through the testimony of four witnesses:

1. Mr. Durand Little was qualified as a water quality expert for the Commonwealth. He testified that on September 1, 1982, he conducted an on-site inspection of defendant's Fayetteville facility and made the following observations:

(a) Defendant's facility is located on land which is higher in elevation than the nearest stream. Four oil separators on the property collect all surface runoff and then separate oil from water. By trapping and collecting surface oil these separators prevent it from being washed into the waters of the Commonwealth.

(b) Once surface water is separated from surface oil, it is discharged into a subsurface pipe where it flows from the separator to an underground collection point called a culvert.

(c) There are three culverts on defendant's property. Each lies at a lower elevation than the preceding one and, because all are at lower elevations than the four separators, all surface water which is discharged flows directly into one of these three culverts. Moreover, since all three culverts are connected by subsurface pipe, all of the water discharged from defendant's separators eventually flows to the lowest point on the property. That point was identified as Culvert no. 1.

(d) Culvert no. 1 receives water directly from Separators nos. 1, 2 and 3. It also receives water from Culvert no. 2 (which receives discharges from Separator no. 4) and Culvert no. 3 (which collects surface runoff from the facility driveway).

(e) Culvert no. 1 lies immediately adjacent to and west of Pennsylvania Highway Route 997.

(f) Accumulated congealed oil was observed inside Culvert no. 1 and effluent was observed flowing from it.

(g) A "grab sample" of the liquid was taken by Mr. Little as it flowed out of Culvert no. 1.

(h) Culvert A lies immediately adjacent to and east of Pennsylvania Route 997. Culvert A and Culvert no. 1 are directly opposite each other and are connected by a subsurface pipe. This pipe permits water to flow from Culvert no. 1 into Culvert A where it discharges into the unnamed tributary mentioned in defendant's Water Quality Permit. This tributary was inspected by Mr. Little. He did not observe any water, oil or other effluent in its bed or on its banks.

(i) Culvert A was not inspected.

(j) Culvert no. 3 was found to be dry. No other culverts were inspected.

(k) Oil separators nos. 1, 2 and 3 were inspected and found to be dry.

(l) A grey-blue sheen common to waste oil was observed inside of Separator no. 4 from a viewing portal. Mr. Little testified that he believed this to be evidence of a malfunction.

(m) There had been no rainfall for at least seven days prior to the inspection.

(n) On September 2, 1982, Mr. Little returned to defendant's property and reinspected Culvert no. 1. He did not observe any oil or effluent in the culvert or in the unnamed tributary.

2. Mrs. Linda Cohen of 539 West Cumberland Road in Enola, Pa. was qualified as an expert witness for the Commonwealth in the field of chemistry and chemical analysis. She testified to the following:

(a) She was employed by the Department of Environmental Resources as a chemist.

(b) She analyzed the "grab sample" taken by Durand Little from Culvert no. 1 on September 1, 1982.

(c) A visual analysis of the sample revealed that it contained more than 15,000 mg/1. of oil. This extremely high volume of effluent prevented more precise measurement of the sample.

3. Mr. Lawrence Clugston of 1800 Rock Road in Chambersburg, Pa. testified for defendant:

(a) He has been an employee of defendant for 17 years and has been the plant manager for the Fayetteville facility for the last 12 years.

(b) He is familiar with the separator-culvert drainage system on defendant's property. He is particularly well-acquainted with the subsurface pipe connecting Culvert no. 2 with Culvert no. 1.

(c) If the accumulation of oil found in Culvert no. 1 was caused by an activity of defendant or emanated from defendant's property, then a malfunction of oil separator no. 4 immediately prior to the inspec-

tion is the only possible explanation for that accumulation. All other separators were discovered to be dry and in proper working order.

(d) Culvert no. 2 receives discharges from Separator no. 4, the separator alleged to be malfunctioning. However, contrary to the testimony of Mr. Little, Culvert no. 2 was inspected and found to be dry. Therefore, Separator no. 4 could not have been responsible for the oil found in Culvert no. 1.

(e) Culvert no. 1 receives all liquid discharged from all four oil separators plus surface water run-off from other properties, including Pennsylvania Route 997.

(f) Culvert no. 1 is open to surface and subsurface drainage. Thus, surface water from other properties and Pennsylvania Route 997 could flow into the culvert.

4. Elmer Baumgardner of 586 Crestwood Drive in Chambersburg, Pa. testified for the defense:

(a) He has been the President of Baumgardner Oil Company, Inc. since 1977.

(b) He helped design the network of separators and culverts which contain and control runoff from the property.

(c) He was informed of the incident which led to these proceedings at approximately 4:30 p.m. on September 1, 1982. He immediately inspected the culvert system and discovered a puddle of oil approximately six by eight inches in diameter and less than one half inch deep inside Culvert no. 1. There was no flow of liquid into or out of that culvert.

(d) Culvert A lies on the west side of Pennsylvania Route 997 and is not part of defendant's property. It was inspected and found to be dry. Each of the other culverts was also inspected and each was found dry.

(e) There was no rainfall or other flow of liquid to carry oil into Culvert no. 1 from higher elevations on defendant's property. Therefore, some person or agency other than defendant was responsible for its presence there.

(f) On two different occasions in 1982, someone other than Baumgardner Oil Company, Inc. dumped waste oil into Culvert A through the steel grates which cover it.

After all the evidence was admitted, the Commonwealth closed its case by arguing that sections 307(c), 602(a), and 611 of the Clean Streams Law, supra, are malum-prohibitum, strict liability offenses which impose criminal responsibility without regard to fault on any person who violates a water quality permit. In addition, the Commonwealth contended that criminal liability could be imposed on Baumgardner Oil Company, Inc. without any proof that it was responsible for the environmental conditions which gave rise to the prosecution.

Section 307(c) of the Clean Streams Law, supra, provides:

"A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance." 35 P.S. §691.307(c).

Section 602(a) of the Clean Streams Law, supra, provides in part:

"Any person or municipality who violates any provision of this act, . . . or any condition of any permit issued pursuant to this act is guilty of a summary offense and, upon conviction, such person or municipality shall be subject to a fine of not less than $100 nor more than $10,000 for each separate offense, and, in default of the payment of such fine, a

person shall be imprisoned for a period of 90 days." 35 P.S. §691.602(a).

Section 611 of the Clean Streams Law provides in part:

"It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, to cause air or water pollution, . . ." 35 P.S. §691.611.

The final page of the Baumgardner Oil Company, Inc. Water Quality Management Permit provides:

"Receiving stream – The oil content in the receiving stream shall not be more than 10mg/l. as the stream discharges from the permittee's property under Pa. 997."

Because the effluent content in the flow of water as it discharged from the defendant's property was 1500 times greater than the 10 mg/l. effluent limitation found in the company water quality permit, the Commonwealth contends that defendant was strictly, absolutely and automatically liable under sections 307(c), 602(a) and 611 of the Clean Streams Law.

We disagreed and entered an order which provided inter alia:

1. "The Commonwealth has proven beyond a reasonable doubt that an oil and/or grease substance in a quantity in excess of 10 milligrams per liter was found in a culvert located on the east side of Route 997 in the public highway right-of-way.

2. The Commonwealth Department of Environmental Resources did not prove beyond a reasonable doubt that the oil and grease substance found in the culvert emanated from any activity of the defendant or from the property of the defendant."

We granted counsel leave to brief the legal issues involved. They have now done so, and the matter is ripe for disposition.

There is absolutely no merit to the Commonwealth's contention that defendant may be found guilty of violating the Clean Streams Law despite the absence of any evidence to prove that it contributed to or caused the unacceptable environmental condition which gave rise to this proceeding. A violation of sections 307(c), 602(a) or 611 of the Clean Streams Law, supra, is a summary criminal offense, 35 P.S. §691.602(a), the prosecution of which is governed by state and federal constitutional principles as well as the Pennsylvania Rules of Criminal Procedure. It is a fundamental rule of constitutional law that in a criminal case the prosecution has the burden of proving all the elements of the offense beyond a reasonable doubt. Commonwealth v. Todd, 477 Pa. 529, 384 A.2d 1215 (1978), Commonwealth v. Harris, 263 Pa. Super. 110, 397 A.2d 424 (1979), Commonwealth v. Vitalcolonna, 297 Pa. Super. 284, 443 A.2d 838 (1982). Since this is a criminal case, the Commonwealth had the burden of proving beyond a reasonable doubt that defendant violated one of the terms or conditions of its water quality permit before it could obtain a conviction.

Defendant's water quality permit is 14 pages long. The first paragraph of the last page expressly limits the amount of effluent that is allowed to flow from Culvert no. 1 into the unnamed tributary. However, after carefully examining the document as a whole, we find that its primary purpose is to limit the quantity of industrial waste which the defendant may lawfully discharge into the waters of the Commonwealth. It was also drafted to limit the amount of such waste which flows from defendant's property. Therefore, proof of oil in Culvert no. 1 is

insufficient evidence to support a conviction unless the Commonwealth can also prove beyond a reasonable doubt that defendant was responsible for its presence there.

We have examined the transcript of the trial of this matter and have identified the following evidence as tending to prove that defendant was responsible for the oil found in Culvert no. 1:

(a) The testimony of Mr. Little that he observed a sheen of oil inside Separator no. 4.

(b) The testimony of Mr. Little that a very small amount of liquid was slowly flowing if not trickling from Culvert no. 1.

However, the following evidence tends to establish that the defendant was not responsible for the oil:

(a) Testimony that Culvert no. 2 was dry.

(b) Testimony that someone other than the defendant dumped oil into Culvert A on two prior occasions.

(c) Testimony that all other culverts were dry.

(d) Testimony that all separators other than Separator no. 4 were dry.

(e) Uncontroverted testimony that there had been no rainfall for at least seven days prior to September 1, 1982.

The weight of the evidence in this case does not establish beyond a reasonable doubt that defendant was responsible for the oil found in Culvert no. 1. Although there is some evidence to indicate that a malfunction of Separator no. 4 caused an unscheduled discharge of oil, more persuasive evidence leads us to conclude that defendant was not responsible for that oil. Therefore, we also conclude the Commonwealth failed to prove Baumgardner Oil Company, Inc. guilty beyond a reasonable doubt of violating either its water quality management

permit or sections 307(c), 602(a), or 611 of the Clean Streams Law.

The Commonwealth cites Commonwealth v. L. Sonneborn Sons, Inc., 164 Pa. Super. 493, 66 A. 2d 584 (1949), and Commonwealth v. Peggs Run Coal Company, 233 Pa. Super. 281, 334 A. 2d 713 (1975) as authority for its argument that defendant in the case at bar is absolutely liable regardless of its degree of responsibility for the presence of oil in the culvert.

In Sonneborn, supra, defendant operated an oil refinery which manufactured a medicinal oil called "nujol". A heavy sulfuric acid sludge was a by-product of the manufacture of "nujol". Two lagoons on defandant's property were used as respositories for the sludge. When they were full, defendant unlawfully discharged their contents into Bear Creek. However, unlike the instant case, there was ample evidence to prove that defendant was responsible for the contaminated stream. After the trial court found it guilty of violating the Clean Streams Law, defendant appealed, arguing that it never intended to discharge the sludge and therefore could not be found guilty. The Superior Court affirmed holding that defendant's intent was wholly immaterial because the offenses charged were malum prohibitum offenses.

A similar situation existed in Commonwealth v. Peggs Run Coal Co., 232 Pa. Super. 361, 334 A. 2d 713 (1975). In that case defendant was charged with violating the Clean Streams Law by discharging debris and silt laden water from its impounding lagoons into Peggs Run, all in violation of its mine operator's permit. Although the trial court found insufficient evidence to sustain a permit violation, the Superior Court reversed, holding that there was sufficient evidence to find, beyond a reasonable doubt,

that the defendant was responsible for the unlawful presence of silt in the waters of the Commonwealth. That evidence consisted of:

1. Inspection samples of water.

2. Testimony that defendant's lagoons were completely full.

3. Testimony that at the alleged point of discharge the water was very black.

4. Admissions by a company official that the defendant was discharging silt from the lagoons into the creek.

In our judgment the Sonneborn, supra, and Peggs Run Coal Co., supra, decisions reinforce our conclusion that criminal liability may not be imposed upon a defendant under the Clean Stream law without proof beyond a reasonable doubt that it was responsible for the unlawful presence of industrial waste or other contaminants in the waters of the Commonwealth.

## ORDER OF COURT

Now, this December 12, 1984, we find defendant, Baumgardner Oil Company, Inc. not guilty of violating sections 307(c), 602(a), or 611 of the Clean Streams Law, 35 P.S. §691.1 et seq.