## Marques v. Bunch

*Stewart Dalzell,* for plaintiff.
*George Bush* and *Francis Grabowski,* for intervenors.
*Christopher Chandor,* for defendant.

GARB, *J.,* October 23, 1980—This is an action in equity instituted by plaintiff against defendant, a neighboring property owner, seeking to enjoin the dumping of sewage sludge upon defendant's property. The Townships of Bedminster and Plumstead by their respective solicitors have intervened as parties plaintiff. It is alleged that defendant for a number of years has been hauling sewage sludge from the sewage treatment plants of Warminster Township, Bucks County and Abington Township, Montgomery County and dumping same upon his property. Defendant operates a sod farm upon his property and utilizes the sludge as a fertilizing agent. It is alleged that the dumping operation and the manner in which it is done has polluted the air by emitting noxious odors which permeate well beyond defendant's property lines as well as polluting the surface streams and ground water. After hearing, a temporary restraining order was entered en-

joining all further dumping upon defendant's property and subsequently a full hearing was held on the merits of the bill in equity. It was agreed that the hearing held pursuant to the application for a temporary restraining order be incorporated by reference into the hearing on the bill in equity. As a result of those hearings we hearby make the following

## FINDINGS OF FACT

1. Plaintiff, Anthony Marques, is an individual residing at R.R. #1, Applebutter Road, Bedminster Township, Pa.

2. Intervening plaintiff, Bedminster Township Board of Supervisors, is the duly constituted governing body of the Township of Bedminster, a second class township with offices located at the Bedminster Township Municipal Building, Bedminster Road, Bedminster, Bucks County.

3. Intervening plaintiff, Plumstead Township Board of Supervisors, is the duly constituted governing body of the Township of Plumstead, a second class township with offices located at the Plumstead Township Municipal Building, Stump Road, Plumsteadville, Bucks County, Pa.

4. Defendant Dewey H. Bunch, Jr. is an individual who trades as Shan-Gri-La Sod Farm. Bunch resides at Haring and Applebutter Roads, Plumstead Township, Pennsylvania, and operates a sod farm and sludge dumping operation on his property.

5. Shan-Gri-La Sod Farm is located in Plumstead Township diagonally across Applebutter Road from the Marques property.

6. On or about December 22, 1976 the Pennsylvania Department of Environmental Resources

(DER) issued a water quality management permit, no. 0976434 to Shan-Gri-La Sod Farm; this permit allowed Bunch to use sewage sludge from Abington and Warminster Townships on his sod farm.

7. The water quality permit was issued pursuant to the Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.1 et seq., and/or the Water Obstruction Act of June 25, 1913, P.L. 555, as amended, 32 P.S. §681 et seq., and provided that "issuance of this permit shall not relieve the permittee of any responsibility under any other law."

8. The water quality permit provides that, inter alia, "failure to comply with the rules and regulations of the Department or the terms or conditions of this permit shall void the authority given to the permittee by the issuance of the permit."

9. The water quality permit requires the permittee to keep records of operation and to submit to DER monthly reports if requested; Bunch kept no records of the operation and submitted no reports to DER.

10. The water quality permit requires that sludge be so handled that no nuisance is created.

11. The DER regulations applicable to the site were promulgated in June, 1977 pursuant to the Pennsylvania Solid Waste Management Act of July 31, 1968, P.L. 788, as amended, 35 P.S. §6001 et seq. [see now, 35 P.S. §6018.101 et seq.].

12. These regulations provide that, inter alia:

a. any sludge applied to the soil be turned under or incorporated into the soil within 24 hours of application;

b. sewage sludge may not be applied when the ground is saturated, covered with snow or frozen or during periods of rain;

c. application of sludge is prohibited within 100

feet of streams and intermittent waterways, 300 feet of water supplies, 50 feet of property lines, and 300 feet of occupied dwellings; and

d. application of sludge in such quantities as to allow run-off to occur or to cause spreading, vector or odor problems is prohibited.

13. Bunch has contracts to haul sludge from Abington Township and Warminster Township for a 20 year period commencing September 1, 1977.

14. Bunch's contracts with Warminster and Abington Townships permit him to terminate his agreement if he is unable to use the farm for disposal without any fault on his part.

15. Soils on the Shan-Gri-La Sod Farm are generally poorly drained and the seasonally high water table is at the surface.

16. The majority of soils occupying the Shan-Gri-La Sod Farm, including all soils along the perimeter of Applebutter Road, do not satisfy DER's minimum requirements for a land application of sewage sludge and are not adequate for sludge disposal.

17. Contrary to the requirements of his permit, Bunch has not kept any records of the amount of sludge he has applied to his property.

18. Contrary to DER regulations, Bunch has applied sludge within 300 feet of water supplies, within 50 feet of property lines and within 300 feet of occupied dwellings.

19. Bunch has applied between 35 and 40 dry tons of sludge per acre per year to his farm in such a manner that two or three years' worth of sludge, or between 70 to 120 dry tons per acre were applied in any given year to each of five 10 acre parcels on a rotational basis.

20. These loading rates were excessive.

21. To avoid the possibility of nitrite-nitrate contamination to the groundwater, sludge application rates should not exceed the nitrogen uptake requirement for the crop being raised; in the case of sod, the maximum application rate would be 8.62 dry tons per acre per year if the soils were well drained and suitable for sludge disposal.

22. Bunch's method of operation was to dump numerous piles of sludge in long rows over a long period of time, and to allow the sludge to remain there until he spread it and turned it under.

23. Bunch's method of "storage" was contrary to DER regulations.

24. Bunch's practice of sludge stockpiling in the field created excessive run-off and an obnoxious odor.

25. DER has been unable to monitor this and other permitted sites regularly because of shortage in its staff.

26. As of April 9, 1980 Bunch was in violation of DER regulations concerning run-off and storage.

27. The sod farm is a source of objectionable odor to surrounding areas.

28. The detectability of the odor from the farm increases down wind and in warm weather.

29. Even after the sludge is turned under, clumps of sludge are exposed to the air and therefore continue to cause odors.

30. Plumstead Township Ordinance Section 913(4) provides that there shall be no emission of odor in such quantities as to be offensive at any point on or beyond the lot boundary line.

31. The sludge odor is so oppressive at times that Marques has difficulty breathing, he has experienced vomiting, and guests to his home have been driven indoors to escape it.

32. Marques' neighbors, the Stoltz family, cannot sleep at times during the summer, when their windows must be open, because of the odor from the sludge.

33. Neighbors as far as a quarter of a mile away can sometimes smell the obnoxious sludge odor.

34. Passersby on the public roads around Shan-Gri-La often smell the sludge odor.

35. The water quality permit required Bunch to install groundwater monitoring wells within 60 days of permit issuance.

36. Bunch did not install the required monitoring wells until late 1978 and the wells were not properly grouted until mid-1979.

37. The groundwater in the area of Shan-Gri-La Sod Farm moves slowly at a rate of only several feet per year.

38. The general direction of groundwater flow from Shan-Gri-La Sod Farm is northwesterly across Applebutter Road towards the Stoltz farm and Marques properties and southwesterly from the rear of the farm towards adjoining properties.

39. Because of the unsuitable soils and the seasonally high water table, sludge dumping contaminates the groundwater; however, groundwater contamination from the sludge may take four to eight months to show up in monitoring well reports.

40. The groundwater beneath the site is being degraded by the sludge dumping operation.

41. A test of monitoring wells on the Bunch farm performed by DER on April 9, 1980 demonstrated that the groundwater beneath the farm is contaminated and exceeds drinking water standards for certain parameters, including total dissolved solids, nitrates, chlorides and iron.

42. A drainage ditch runs along the perimeter of Shan-Gri-La Sod Farm parallel to Applebutter Road

and at two points drainage pipes carry the effluent under Applebutter Road to the Marques side of the road and into an intermittent waterway which, in turn, runs across the Stoltz farm and onto the Marques property.

43. Tests of run-off leaving Shan-Gri-La Sod Farm as of January 20, 1979 demonstrated elevated levels of iron, manganese, chromium, copper, nickel, zinc, total solids and total dissolved solids, chloride, lead, cadmium and total coliforms leaving the farm through the drainage pipe under Applebutter Road.

44. Contaminants were leaving the sod farm in the run-off in 1979.

45. In March, 1980 there was a high amount of organic matter leaving the sod farm and entering the stream across Applebutter Road and pollutants from the Shan-Gri-La sludge disposal site entering the stream increased downstream concentrations of BOD, iron, manganese, copper, total solids, total dissolved solids, ammonia nitrogen and chloride.

46. In March, 1980 a parameter used to measure biochemical oxygen demand of contaminating organisms was twice the strength of raw sewage.

47. In March, 1980 the BOD and ammonia nitrogen levels could adversely affect the stream by removing oxygen and rendering the stream unsuitable for fish life.

48. The copper concentration entering the intermittent waterway in March, 1980 was sufficient to kill *all* aquatic life.

49. Another stream flows from the Bunch property across to the Landis property and past a pond. This stream overflowed about five years ago into the pond and within about five days after the stream overflowed there was a large fish kill in the pond. At the time of the fish kill Bunch was dump-

ing sludge in the area which is the watershed for this stream.

50. The quantity of water and certain chemicals and metals contained in the sludge varies from time to time, water in the sludge increases run-off and also increases the time needed to dewater the sludge to a point where it can be spread and worked into the soil.

51. The hay bales and level spreaders installed by Bunch do not eliminate runoff or prevent dissolved solids from leaving the sludge site.

52. Dairy cattle drink from the streams which have their head waters on the Bunch farm.

53. A number of dairy farms surround the sludge site, and if the water becomes contaminated these dairy operations would have to be shut down.

54. As of April 9, 1980 Bunch was in violation of DER's regulations concerning run-off.

55. An analysis of the Warminster sludge performed in May of 1978 demonstrated that the cadmium content of the sludge was 575 parts per million, over 11 times the amount permitted by DER.

56. Neither DER nor defendant took any action to halt the dumping of Warminster sludge until December of 1978.

57. Cadmium is a highly toxic element if ingested by animals or humans; cadmium is taken up very readily by plants and therefore represents a potential threat to the food chain.

58. Soil levels of copper, zinc, cadmium, nickel and lead should be in the low range if the soil has not received additions of metals or these trace elements from municipal and/or industrial sludges.

59. Soil cadmium levels greater than one part per million (two pounds per acre) represent a threat of excess cadmium in the food chain. At present there is no universally accepted "safe" level of

cadmium in the soil and food chain crops that will not lead to further problems due to chronic, low-level intake of this element.

60. To control the amount of cadmium added to the soil, DER's recommended lifetime limitation for cadmium is three pounds per acre.

61. Soil samples taken from the stream on the Stoltz property show higher than normal values for copper, cadmium and zinc which would not be expected if the soils had not received sludge or some type of waste.

62. Soil tests from the Stoltz pasture across Applebutter Road from Shan-Gri-La Sod Farm showed cadmium readings as high as 2.46 pounds per acre, and soil samples from seeded sod on the Bunch property showed cadmium readings as high as 8.04 pounds per acre.

63. The only effective way to remove the cadmium from the land is to strip the soil.

64. Cadmium is transmitted into the food chain by uptake of the plants growing in cadmium enriched soils or mediums; the element becomes part of the food parts of the tissue of the plant and is transmitted to any animal or human which eats the plants.

65. Tests of grass samples taken from the Stoltz stream showed a cadmium content twice as high as grass taken from another area of the Stoltz farm which is removed from the stream leaving the Bunch property.

66. Tests of the cadmium content of tissues from the liver and kidney of beef cattle which grazed near the stream on Stoltz's farm indicated elevated levels of cadmium in the liver (.205 compared with a normal range of .04-.12) and in the kidneys (1.77 compared with a normal range of .27-.48).

67. Blood tests performed on Stoltz's three year

old son, who had eaten beef from cattle raised on the Stoltz farm, indicated that the cadmium in his blood serum was .8 micrograms per deciliter, compared to a normal range of .1 to .5 micrograms per deciliter.

68. An above normal cadmium level can damage human kidneys.

69. Tests of soil, grass, cow meat and blood serum demonstrate that cadmium from run-off from sludge dumped on the sod farm has entered the food chain, constituting a serious danger to citizens of the Commonwealth.

## DISCUSSION

As we have found, from at least December 22, 1976 defendant conducted this sludge dumping operation pursuant to a water quality management permit issued by DER pursuant to the Pennsylvania Clean Streams Law of June 22, 1937, P.L. 1987, art I, sec. 1, as amended from time to time and most recently by the Act of October 10, 1980, P.L. 894, No. 157, §1, 35 P.S. §691 et seq. However, and in spite of that permit, we find herein that the manner in which defendant has conducted this operation constitutes a nuisance, both public and private, which must be enjoined.

It is clear that equity may enjoin an otherwise lawful business when its operation is so unreasonable as to constitute a nuisance: Dexter v. Bebenek, 458 Pa. 1, 327 A. 2d 38 (1974). The mere fact that this sludge dumping operation was conducted pursuant to a permit issued by DER pursuant to the provisions of the Clean Streams Law does not derogate from the proposition. The traditional common law remedies to abate such a nuisance are not

superseded or in any way abrogated by the Clean Streams Law. Section 701 of that act provides as follows:

"The collection of any penalty under the provisions of this act shall not be construed as estopping the Commonwealth, or any district attorney or solicitor of a municipality, from proceeding in courts of law or equity to abate pollution forbidden under this act, or abate nuisances under existing law. It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to abate the pollution of the waters of this Commonwealth, and nothing in this act contained shall in any way abridge or alter rights of action or remedies now or hereafter existing in equity, or under the common law or statutory law, criminal or civil, nor shall any provision in this act, or the granting of any permit under this act, or any act done by virtue of this act, be construed as estopping the Commonwealth, persons or municipalities, and the exercise of their rights under the common law or decisional law or in equity, from proceeding in courts of law or equity to suppress nuisances, or to abate any pollution now or hereafter existing, or enforce common law or statutory rights."

Furthermore, it is provided in section 601 as follows: "Any activity or condition declared by this act to be a nuisance, shall be abatable in the manner provided by law or equity for the abatement of public nuisances. . . ."

In interpreting the effects of the Clean Streams Law upon the common law or decisional law of this Commonwealth regarding the abatement of such nuisances our Supreme Court has provided that common law remedies in equity remain available.

In Com. ex rel. Shumaker v. New York & Pennsylvania Company, Inc., 367 Pa. 40, 79 A. 2d 439 (1951), it was held that corruption of water, when it affects the public use of a stream or menaces the public health, becomes a public nuisance which the Commonwealth may suppress by criminal proceedings upon indictment for maintaining a public nuisance and upon conviction the court may in its sentence include an order requiring the abatement of the nuisance. Also the Commonwealth may proceed in equity for an injunction requiring abatement of the nuisance. The Clean Streams Law was declared to be declaratory only of the common law relating to nuisances, for corruption of waterways has long been recognized as both a public and private nuisance. Therein the legislature merely declared its public policy of what discharges were to be considered as public nuisances in contradistinction to private nuisances, but not merely for the purposes of the act. In quoting from Com. v. Dietz, 285 Pa. 511, 132 Atl. 572 (1926), the court in Shumaker held as follows, 367 Pa. at 49:

"'When the legislature validly pronounces a particular state of affairs to be a nuisance prejudicial to the public health, it is as much so as if the proscribed situation had been considered a "nuisance . . . at common law," and "may be prohibited by the same remedies.'" To this we may well add it is so, a fortiori, where the proscribed conditions were already recognized as a nuisance at common law."

In so holding and in citing section 701 of the Clean Streams Law the Supreme Court in Shumaker held that the legislature did not provide an exclusive remedy thus ousting consideration of all other remedies which formerly existed.

Having found that this court may grant the relief requested if a public nuisance is found to exist, we come to the question of whether the conduct of defendant as established by our findings of fact constitutes such a public nuisance under the provisions of the Clean Streams Law. A thing may be a public nuisance because it is so declared by statute, either explicitly or implicitly. Alternatively, it may be declared a nuisance as a matter of common law, though not prohibited by statute, if it unreasonably interferes with the rights of the public: Com. v. MacDonald, 464 Pa. 435, 347 A. 2d 290 (1975). We believe that although this specific condition may not be explicitly addressed by the Clean Streams Law, it is declared to be a public nuisance by the terms of that act and it therefore constitutes an implicitly declared statutory public nuisance. See Philadelphia Chewing Gum Corporation v. DER, 35 Pa. Commonwealth Ct. 443, 387 A. 2d 142 (1978). Section 402(b) of the Clean Streams Law provides that conducting any particular activity without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the board is declared to be a nuisance: DER v. Borough of Carlisle, 16 Pa. Commonwealth Ct. 341, 330 A. 2d 293 (1974). Although defendant had a permit, we have found that the activity was conducted contrary to the rules and regulations of the board and also contrary to the terms and provisions of the permit. Therefore, under the specific provisions of the Clean Streams Law the activities and their manner of conduct constituted a public nuisance.

Furthermore, we are satisfied that the activity of defendant unreasonably interferes with the rights of the public. The record fully supports our finding

that defendant's activities cause or contribute to the pollution of the stream and the surface and ground waters leaving defendant's property or at least creates a danger of such pollution. The public has a sufficient interest in clean streams alone in order to justify such relief even in the absence of facts supporting concepts of negligence,* foreseeability or unlawful conduct, and the mere fact of legislative authority is not a defense. See Com. v. Barnes & Tucker Company, 455 Pa. 392, 319 A. 2d 871 (1974).

We are likewise satisfied on this record that plaintiff has established a right to relief on the basis of a private nuisance. The Supreme Court in Waschak v. Moffat, 379 Pa. 411, 109 A. 2d 310 (1954), adopted section 822 of the Restatement, Torts, in establishing the prerequisites of a private nuisance. That section provides as follows:

"The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if, (a) the other property rights and privileges in respect to the use of enjoyment interfered with; and (b) the invasion is substantial; and (c) the actor's conduct is a legal cause of the invasion; and (d) the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct." See also Folmar v. Elliot Coal Mining Company, Inc. 441 Pa. 592, 272 A. 2d 910 (1971).

In applying this dogma it is clearly established that plaintiff has property rights and privileges in respect to the use or enjoyment of his property

---

*This will be addressed, infra.

which were interfered with, the invasion is substantial and defendant's conduct is a legal cause of the invasion. Although the invasion was not intentional and is therefore unintentional, we likewise find that it was actionable under the rules governing liability for negligent conduct. It is clearly established that defendant applied the sludge to his farm in quantities far in excess of that which the land was able to receive and reasonably integrate. On many occasions he spread it in rows or deposited it in piles leaving it unspread and unplowed for long periods of time. The sludge itself was composed of large quantities of deleterious, pollutant and harmful materials. When it was spread or merely deposited in piles or rows it was done close to the open streams traversing defendant's property, close to the roads and boundaries of his property and close to dwelling houses. In such condition it permitted strong and noxious permeation of the air in the form of repugnant odors which emanated far beyond defendant's property lines and to the property of plaintiff and other neighbors' dwellings. It was manifestly noticeable and obnoxious to any persons traveling the roads which bordered defendant's property. On occasion plaintiff was unable to utilize the outside of his premises for social functions or merely for normal living outside of his premises and other neighbors found it impossible to sleep on warm evenings with the windows open. In addition, as we have found, the polluting materials found in the sludge found their way in large quantities into the streams traversing defendant's property which led to the property of his neighbors which streams were used as drinking water for livestock on dairy farms. It permeated and corrupted the ground waters to such an extent that pasture lands of his

neighbors were infected with its contaminants. Furthermore, left in the condition in which it was in piles and rows it polluted the surface run-off water from defendant's property to those of his neighbors including that of plaintiff. We are satisfied that this condition created by defendant constituted an actionable invasion upon plaintiff's property in a negligent manner. For this reason we are satisfied that the conduct of defendant in invading plaintiff's property both by virtue of the air quality as well as the surface and ground waters, although unintentional, was negligent.

Having so found the only question remaining is the nature of the relief to be granted. We recognize that when an action in equity is brought to abate a public nuisance the right to relief is not restricted by any balancing of equities, nor by any rule of damnum absque injuria. However, the exercise of our power is restricted by the parameters of reason: Com. v. Barnes & Tucker Company, supra. Therefore, and in view of the fact that there was evidence on this record that there may be a manner in which defendant can be permitted to resume the dumping of sludge upon his property under controlled and restricted conditions, we think it appropriate to permit him to attempt to evolve an appropriate plan in order to be permitted to do so. Therefore, we will enter an order enjoining him from all further dumping of sludge upon the premises in question until such time as a manner or method of dumping such sludge can be evolved which would be consistent with the abatement of the public and private nuisance he has created in the past and under such conditions whereby such proposal is reviewed and approved by DER, but only then upon the assurance by DER that it can and will police the operation to enforce the order which may ultimately be entered.

If such a proposal is made by defendant and approved by DER we will entertain an application to amend the order we hereby enter but only upon further proceedings and further order of this court.

## CONCLUSIONS OF LAW

1. Bunch's sludge dumping activities are governed, inter alia, by the Clean Streams Law, the Solid Waste Management Act, and the regulations promulgated pursuant thereto.

2. Pursuant to the Clean Streams Law and the Solid Waste Management Act, discharges of sewage sludge without a permit, or contrary to the terms and conditions of a permit, or contrary to the rules and regulations of DER, are a nuisance: 35 P.S. §691.402(b); Solid Waste Management Act of July 7, 1980, P.L. 380, sec. 601, 35 P.S. §6018.601.

3. Bunch has operated his farm in violation of section 302 of the Solid Waste Management Act, as amended, and subsections 75.32(c)(1), (2), (3), (4), (5), (8) and (9), and subsections 75.32(e), (1), (i), (ii), (2), (3), (4) and (5) of the regulations promulgated under the Solid Waste Management Act, 25 Pa. Code §75.32.

4. Bunch has operated his sod farm, and has dumped sewage sludge on his property, contrary to the terms and conditions of his permit. Specifically, Bunch has failed to maintain any records of his operation, he has permitted contaminants to enter the waters of the Commonwealth, he has created a nuisance through his sludge dumping operation, and he has violated DER's Rules and Regulations.

5. Bunch's sludge dumping has resulted in a foul and obnoxious odor that constitutes a private nuisance to surrounding landowners, as well as constituting a public nuisance.

6. Bunch's sludge dumping activities violate Plumstead Township zoning ordinance, Article I, section 913(4): "Control of Odors." This ordinance provides that "[t]here shall be no emission of odorous gases or other odorous matter in such quantities as to be offensive at any point on or beyond the lot boundary line."

7. The run-off from Shan-Gri-La Sod Farm has contaminated the water in the intermittent waterway crossing the Stoltz and Marques properties, and the stench and the contamination of these waters constitute a public nuisance and a danger to the public health.

8. Bunch's sludge dumping has contaminated the ground waters beneath his farm, and this contamination constitutes a private nuisance to plaintiffs and a public nuisance which endangers the health and welfare of citizens of the Commonwealth.

9. The streams and intermittent waterways which cross or have their headwaters on the Bunch farm, including the stream which crosses the Stoltz and Marques properties and the stream which crosses to the Landis property, are part of the waters of the Commonwealth, and the groundwater beneath the sod farm is a part of the waters of the Commonwealth.

10. Bunch's sludge dumping activities have resulted in the pollution of both surface waters and groundwaters of the Commonwealth in violation of Bunch's permit, the Clean Streams Law, and Pa. Const., Art. 1, § 27.

11. The contamination of waters of the Commonwealth constitutes a per se public nuisance.

12. Such nuisances are abatable in the manner provided by law or equity for abatement of nuisances.

13.  Any public benefit from the land application of sewage sludge on the Bunch site is outweighed by the environmental harm and the danger to the health and welfare of the citizens of the Commonwealth caused by the sludge and the contaminants it contains, and there are alternative sites where Bunch can dump the Abington sludge.

14. Plaintiffs have suffered substantial and irreparable harm, and they have no adequate remedy at law.

### DECREE NISI

And now, October 23, 1980 it is hereby ordered, directed and decreed that the temporary restraining order heretofore entered shall be made permanent and it is therefore ordered that defendant is enjoined from any further depositing, dumping or placing of sludge upon the premises in question until further order of the court.

This shall be entered as a decree nisi which shall be entered as a final order by the prothonotary by praecipe of any party unless exceptions be filed within ten days of the date hereof.

Costs on defendant.